Elmer **ANDREWS**, Plaintiff,

v.

**PRECISION APPARATUS INC.,** Transvision Electronics, Incorporated, and Pacotronics, Inc., Defendants.

United States District Court
S. D. New York.
May 13, 1963.

33. 15 U.S.C. 78w(a) (1958).

Fisch, Kaplan & Goldman, New York City, for plaintiff; Richard L. Fisch, New York City, of counsel.

Burton H. Brody, New York City, for defendants.

WYATT, District Judge.

This is an application by plaintiff for a preliminary injunction restraining defendants

(a) from merging Pacotronics Inc. and Transvision Electronics Incorporated into Precision Apparatus, Inc., and

(b) from utilizing assets of Transvision to pay indebtedness of Pacotronics.

The action is for a permanent injunction against the same acts, for judgment rendering "the fraudulent merger null and void" and returning "the parties to their status quo", and for an accounting. Although not alleged in the complaint, it is assumed that plaintiff claims an interest in this matter as a stockholder of Transvision.

For the reasons set forth herein, the application is denied.

Plaintiff is a citizen of New Jersey, Precision is a Delaware corporation, Transvision and Pacotronics are New York corporations. Diversity of citizenship is the basis of jurisdiction (28 U.S. C.A. § 1332).

Transvision was incorporated in 1960 and acquired the assets of a predecessor corporation. It had outstanding at all relevant times 287,000 shares of common stock.

The status of plaintiff as a stockholder of Transvision is unusual. As noted above, the complaint does not allege that he is the owner of any shares. His moving affidavit states, however, that he is "a shareholder of shares of stock" of Transvision.

It appears that under date of August 4, 1960 Suesholtz, then president of Transvision, signed a memorandum transferring ownership of two shares to plaintiff, then an employee of Trans-

vision. The memorandum states that the shares were at the time held as collateral for a debt, that plaintiff would not leave his employment for two years and that Suesholtz would have all the voting rights of the two shares for five years. The memorandum was kept by plaintiff.

The shares of Transvision were thereafter split 200 for 1 and on September 6, 1962 (just before his removal as president on September 7, 1962) Suesholtz endorsed and gave to plaintiff a certificate for 400 shares of Transvision common stock; this certificate has since been in the possession of plaintiff. The certificate was then and has remained in the name of Suesholtz, doubtless because (under the memorandum) Suesholtz is to have the voting rights of the shares until August 4, 1965.

Transvision engaged in the production and sale of specialized TV equipment and electronic devices, especially for educational purposes. Suesholtz was chief executive officer and a principal promoter of Transvision until September 7, 1962. Plaintiff was an employee of Transvision until March 1, 1963.

Transvision stock had been publicly offered as a speculation by underwriters in September 1961 and, at least since that time, had been traded over-the-counter.

In the period from June 20, 1960 to April 30, 1961 Transvision had net income of $853 on sales of $467,768; for the year ended April 30, 1962 it had a net loss of $232,276 on sales of $548,841; for the 6 months ended October 31, 1962 it had a net loss of $120,506 on sales of $237,814; thereafter it continued to have substantial losses. The complaint (verified March 21, 1963) alleges that "Transvision, except for a minor segment of its business, is virtually in liquidation".

In July 1962 Baruch-Foster Company bought 151,970 shares of Transvision, or about 54 per cent of the shares outstanding. Suesholtz had recommended shortly before that Transvision itself buy 90,000 shares of its own stock at $3.25 per share, but this was not done.

After its purchase, Baruch-Foster elected a majority of directors of Transvision; there were seven Transvision directors, of whom Baruch-Foster elected four. On September 7, 1962 the directors removed Suesholtz as president, apparently because of the operating losses sustained. Suesholtz remained as a director and began an arbitration proceeding over his right to remain as president, evidently basing his claim on an employment contract between him and Transvision.

On January 31, 1963 Pacotronics bought from Baruch-Foster the same 151,970 shares of Transvision for $539,000, or about $3.55 per share. Pacotronics paid the purchase price to Baruch-Foster in full, using $39,000 of its own funds and borrowing $500,000 on its note, secured by pledge of the 151,970 Transvision shares and also other securities.

Pacotronics and its predecessors have been in business for a number of years, making and selling electronic test equipment, high fidelity components, etc. For the year ended January 31, 1961 it had net income of $27,551.09 on sales of $2,196,712.31; for the year ended January 31, 1962 it had net income of $9,286.86 on sales of $2,404,789.98; for the nine months ended October 31, 1962 it had a net loss of $58,231 on sales of $1,767,052.

Having acquired 54 per cent of the shares of Transvision on January 31, 1963, Pacotronics set about to effect a merger between it and Transvision. While Transvision was "virtually in liquidation", it did have substantial quick assets which, after a merger, could be used to pay off the debt which Pacotronics had incurred to buy the 54 per cent block of Transvision shares.

Pacotronics had a wholly owned subsidiary, Precision Apparatus, a Delaware corporation. The plan of Pacotronics was to consolidate Transvision, Pacotronics and Precision Apparatus into a

new Delaware corporation to be called "Precision Apparatus". This could be done under New York Stock Corporation Law, McK.Consol.Laws, c. 59, § 91 by a two-thirds vote of the outstanding shares of Transvision and Pacotronics. This is the plan which has been largely carried out and against which and certain of its consequences plaintiff is here asking a preliminary injunction.

In putting its merger or consolidation plan into effect, Pacotronics failed in several respects to conform to accepted standards for proper corporate procedure; it is this failure which gives rise to many of the charges of plaintiff.

A meeting of the board of directors of Transvision was called for February 4, 1963. Purposes were set forth in the notice of meeting but—although it must have been a most important item—nothing was said in the notice about any proposed merger of Transvision and Pacotronics.

A meeting of directors of Transvision was held on February 4, 1963. The four Baruch-Foster directors resigned and in their place were elected four nominees of Pacotronics. The three other directors were Suesholtz, King and McKenna. The two last named were not employees of Transvision; they were independent outside directors. King is a member of the New York bar and apparently represented, or was connected with, persons who had invested from $80,000 to $100,000 in Transvision stock. McKenna is manager of public relations of a large industrial company and personally owns some Transvision stock.

At the February 4, 1963 meeting of directors, Nearing resigned as secretary of Transvision and Ezrine (a nominee of Pacotronics and its counsel) was elected in his place.

There is conflict in the testimony and other evidence as to whether at the February 4, 1963 meeting of directors there was a vote taken on the plan of consolidation. It is found that no such vote was taken, in the sense of a deliberate, meaningful, and understood act of the directors to approve a specific plan and to recommend its submission to stockholders. Undoubtedly there was discussion at the February 4 meeting of a merger of Transvision and Pacotronics and Precision, of the share for share basis thereof, of the make up of the directorate of the surviving corporation, of the retirement of some Transvision stock, and concerning the possible advantages of a merger. Undoubtedly some explanation was made by the Pacotronics representatives of the nature of that business and of its operating results; Suesholtz was already familiar with the name of Pacotronics and said at the meeting that it was a good name. The three directors present at the meeting and who were nominees of Pacotronics were clearly in favor of the merger but since Suesholtz, King and McKenna were at most neutral and uncommitted, it is apparent that no board action could have been taken to approve and recommend a plan of consolidation.

Under date of February 26, 1963 a printed notice was sent out of a special meeting of Transvision stockholders, to be held March 11, 1963, to vote on a proposed agreement of consolidation of Transvision, Pacotronics and Precision. A copy of the agreement was sent to each stockholder of Transvision as part of a proxy statement and proxies were solicited. It was stated that February 22, 1963 had been fixed as the record date to determine the stockholders of Transvision entitled to notice of and to vote at the special meeting.

The proposed agreement of consolidation provided, among other things, (a) that shares of Transvision and Pacotronics would be converted share for share into shares of the new Delaware Corporation, (b) that the 151,970 Transvision shares owned by Pacotronics would be cancelled, and (c) that the outstanding shares of the old Precision Apparatus (all owned by Pacotronics) would be cancelled. Provision was made for six directors of the new corporation; the directors of Transvision except Suesholtz

were named as directors of the new corporation.

The notice to stockholders purported to be signed by order of the Board by Nearing as assistant secretary. In fact the Board had not in any formal meeting either ordered the call of the meeting or fixed a record date. Nearing did not sign the notice and he was not assistant secretary of Transvision when the notice was sent out.

After notice of the meeting had been sent out, King and McKenna continued to doubt the advisability of the merger. McKenna prepared a draft of a letter to the Transvision directors in which he set down strong criticisms of the proxy statement and suggested that the meeting of stockholders be postponed from March 11.

Suesholtz, King and McKenna met on March 6, 1963; McKenna gave the two others a copy of his draft letter. The three then went the same day and discussed with representatives of Pacotronics the plan of consolidation and the proxy statement. McKenna raised questions based on his draft letter. He and King were evidently convinced by the explanations made in behalf of Pacotronics. They decided to support the consolidation and McKenna's draft letter was never sent.

On the record date for the special meeting of stockholders (February 22, 1963) the 151,970 Transvision shares purchased by Pacotronics still stood in the name of Baruch-Foster, the former owner. Apparently this was due to the failure of the pledgee of the shares to present the certificates to the Transfer Agent for transfer to the name of Pacotronics. Having learned of this omission, Pacotronics caused the certificates to be presented to the Transfer Agent on March 5, 1963. The Transfer Agent on the same date issued a new certificate in the name of Pacotronics; the books of the Transfer Agent reflect that the transfer was made "3–5–63 as of 2–22–63".

About the same time, Baruch-Foster executed and delivered two proxies in respect of the shares which had been in its name on the record date. The 151,970 shares had been represented by two certificates, one for 127,970 shares and the other for 24,000 shares. The Baruch-Foster proxy covering 127,970 shares was sent by mail to Nearing with instructions to vote it in favor of consolidation, if necessary. Ezrine told Nearing that this proxy was not needed and Nearing then returned it to Baruch-Foster. The Baruch-Foster proxy covering the 24,000 shares was given to Rosen (elected president of Transvision on February 4, 1963) just before the March 11, 1963 special meeting of stockholders; it was not marked for or against consolidation but the proxy form stated that, absent such direction, the proxy would be voted for consolidation.

The special meeting of stockholders of Transvision was held on March 11, 1963. There were apparently twenty or more persons present. There was a lengthy discussion; the meeting lasted more than three hours. Suesholtz was present and participated actively by making statements, asking questions, making motions, voting shares, (including those of plaintiff), etc.; his attorney was also present. King and McKenna were there and either voted shares in favor of consolidation or generally favored consolidation. Suesholtz voted 600 shares in his name (400 being those of plaintiff) against consolidation.

It is not clear from the record how the voting was conducted in detail. Two stenographic transcripts were submitted to the Court.

The transcript submitted for plaintiff indicates that the chairman of the meeting appointed "Mr. Cass and Mr. Springer" as inspectors but when told that "Mr. Cass" was not present appointed "Mr. Morton and Mr. Springer" as inspectors. It then indicates that Siegel signed an oath that he would "count the vote fairly".

The transcript submitted for defendants indicates that the chairman of the meeting appointed "Mr. Katz and Mr. Springer * * * and Mr. Morton Richter" as inspectors, that one Gold asked that Siegel be a "counter on the election", and that Ezrine agreed to this.

A written oath of inspectors was signed by Springer, Richter and Siegel; red ink lines have been drawn through the signature of Siegel.

Both transcripts show that the Chairman announced the vote as 209,723 shares for consolidation and 26,560 shares against; also that the Chairman asked the inspectors to execute their certificate. The transcript for defendants states that the inspectors executed their certificate before a notary public.

Both transcripts show that Siegel protested the vote because he had been "forthwith removed from my office" as inspector by Ezrine because he had challenged a proxy (presumably the Pacotronics proxy). If this be true (and the certificate of inspectors, as will be seen, was not signed by Siegel) it was an irregularity. Since there were two inspectors who did act, and since inspectors perform a ministerial function only, the irregularity does not affect the result.

The certificate of inspectors received in evidence is executed by Morton J. Richter and Harold Springer and was acknowledged before a notary public on March 11, 1963. The certificate is typed, with spaces left blank for some information, including the votes. These blank spaces for the votes show in ink handwriting "236,283" as the number of votes cast with lines drawn through these figures and "223,394" written alongside; also "209,723" as the votes cast for consolidation with lines drawn through these figures and "196,534" written alongside; also "26,560" as the votes cast against consolidation, but the "5" in these figures appears to be written over by an "8". There are initials in the margin near these changes.

The correction by the inspectors of the figure "26,560" to "26,860" is explained

in the stenographic transcripts as due to the presentation of a proxy for 300 shares after the vote had been taken; these were nevertheless permitted to be voted against consolidation. The other corrections are explained by counsel for defendants and by Nearing (who was present at the meeting) as due to an arithmetical error by the inspectors in their first count of the votes for consolidation.

New York Stock Corporation Law § 91 requires authorization of consolidation from holders of two-thirds of the shares, or in the case of Transvision, from the holders of more than 191,334 shares. Thus, the smaller corrected vote shown in the certificate of inspectors is still more than the required two-thirds. At the Court's request, the proxies voted at the meeting were submitted and these show more than a two-thirds vote for consolidation.

A certificate of consolidation pursuant to Stock Corporation Law § 91 was filed in the office of the New York Secretary of State on March 12, 1963. This certificate recited the consolidation of Transvision, Pacotronics and Precision Apparatus into Precision Apparatus, Inc. (a new Delaware corporation).

On the same day, March 12, 1963, at three o'clock in the afternoon a plan and agreement of consolidation was filed in the office of the Secretary of State of Delaware pursuant to Section 252 of the Delaware Corporation Law.

On the same day, March 12, 1963, Suesholtz obtained an order to show cause from the New York Supreme Court, Westchester County, in an action by him against Pacotronics, Transvision and others (but not Precision Apparatus, Inc.). The order required defendants to show cause why a temporary injunction should not be granted substantially as prayed for herein. It appears that this application was eventually heard and denied by the State court.

Thereafter plaintiff commenced his action in this court and made the present application for a preliminary injunction.

Plaintiff urged as a distinction between his action and that of Suesholtz, that Precision Apparatus, Inc., which is said to be in control of all assets after filing the consolidation documents, is a defendant here whereas it is not a party to the Suesholtz action.

■ It will be assumed that plaintiff has a sufficient interest to prosecute this action. He is not a stockholder of record of Transvision and has no voting rights in any event until 1965. A beneficial owner of shares may maintain an action. Cavanagh v. L. & R. Trucking & Warehouse Co., Inc., 29 Misc.2d 576, 215 N.Y.S.2d 902 (Special Term, New York County, 1961); Marco v. Dulles, 177 F. Supp. 533 at 551–552 (S.D.N.Y.1959). We assume (without deciding) that the principle is the same where the beneficial owner has by agreement placed the voting rights in another for a substantial period.

The grounds on which plaintiff asks for a preliminary injunction against the consolidation will be separately examined.

*Directors meeting of February 4, 1963.*

■ Plaintiff argues that no vote of directors was ever taken on the plan of consolidation and that, even had there been a vote, it was of no effect because nothing was said about this matter in the notice of meeting. As already indicated the plaintiff is correct as to the facts: there was no vote of directors and the notice did not refer to the matter. A preliminary injunction is not warranted on this account, however, because no vote of directors on consolidation is required by New York law; authority from the necessary two-thirds of the shares is itself sufficient (Stock Corporation Law § 91).

*Notice of the March 11, 1963 Special Meeting of Stockholders.*

■ Plaintiff points to a defect in the notice of this meeting. It purports to be signed by Nearing as Assistant Secretary. In fact Nearing did not sign it and at its date was not Assistant Secretary or any other officer of the corporation. Plaintiff argues that under Stock Corporation Law § 45 all action taken at the meeting is a nullity because of the defect.

The notice of the meeting did accomplish its purpose, whether Nearing signed it or not. Stockholders were properly advised of the time, place and purposes of the meeting and sufficiently in advance of the meeting to comply with the statute. There is nothing to show that the defect was calculated or was designed to secure some improper advantage; Rosen or Ezrine could have easily put his name to the notice. The situation here differs from that in Janaug, Inc. v. Szlapka, 6 Misc.2d 84, 162 N.Y.S.2d 668 (Special Term, N.Y.County 1957) cited for plaintiff. In Janaug, the notice was signed by two of three directors, was of a meeting of stockholders to remove officers, and was sent out only six days before the day on which the meeting was to be held, whereas at least ten days notice is required by Stock Corporation Law § 45.

In the case at bar, plaintiff is not a stockholder of record and therefore was not entitled to any notice.

Moreover, Suesholtz, record-holder of plaintiff's shares, attended the meeting and participated. This would amount to a waiver of any defect in the notice. In re Roosevelt Leather Hand Bag Co., Sup., 68 N.Y.S.2d 735 (Special Term, N.Y. County 1947). See Flagg-Utica Corp. v. Baselice, 14 Misc.2d 476, 178 N.Y.S.2d 860 (Special Term, N.Y.County 1958).

*Voting of Transvision Shares by Pacotronics.*

■ Plaintiff contends that the 151,970 shares owned by Pacotronics cannot be counted as votes for consolidation because the proxy as to these shares was executed by Pacotronics whereas the shares on the record date were in the name of Baruch-Foster. Without these shares (54 per cent of total shares) consolidation was not authorized by the necessary two-thirds.

Baruch-Foster, in whose name the shares stood on the record date, was the only person entitled to vote the shares

at the March 11 meeting. So stated the notice of meeting. So states New York Stock Corporation Law § 47. Since transfer was actually made after the record date, it was completely ineffective to attempt to make the transfer "as of" the record date. Pacotronics obtained proxies from Baruch-Foster and according to proper corporate practice should have submitted these at the voting.

But instead Pacotronics itself executed a proxy for the 151,970 shares and these votes were allowed by two of the inspectors of election and by Transvision itself. Should the Court set aside the voting and the authority for consolidation because the beneficial owner was allowed to vote the shares? We do not feel that such a result is required.

On February 22 as well as on March 11, Pacotronics was clearly the beneficial owner of the shares, subject to pledge for the substantial part of the purchase price borrowed by Pacotronics. Baruch-Foster had been fully paid and had no interest whatever in the shares. Baruch-Foster was under a statutory duty to give a proxy to Pacotronics (Stock Corporation Law § 47) and it complied with its duty. "As between the record holder of corporate stock and the beneficial owner thereof, the latter is the person entitled to vote the stock" (Flagg-Utica Corp. v. Baselice, 14 Misc.2d 476, 178 N.Y.S.2d 860, Special Term, N.Y. County, (1958)). Provisions in statutes and by-laws which entitle the holder of record to vote are for the benefit of the corporation, to avoid forcing the corporation into a burdensome determination of the beneficial ownership of its shares.

But where the corporation has accepted for voting a proxy from the beneficial owner, who had in fact obtained a proxy from the record holder, it would be idle ceremonial to nullify these votes. If the record holder, the beneficial owner and the corporation are in agreement, other stockholders have no cause for complaint.

*Proxy Statement.*

■ Plaintiff argues that the proxy statement sent to stockholders to put before them the plan of consolidation was false and misleading.

Nearly all of the matters specified by plaintiff as false are alleged overstatements as to the condition and prospects of Transvision; plaintiff states that "Transvision—except for a minor segment of its business—is virtually in liquidation". It is difficult to see how plaintiff, as a stockholder of Transvision, can complain as to overstatements concerning Transvision. Certainly plaintiff was not misled (a) because he had been employed by Transvision and its predecessors for about 15 years as an engineer, for about two years before March 1, 1963 had been chief engineer for Transvision and as counsel for plaintiff puts it "was fully cognizant of the goings on in the company", and (b) because the shares of plaintiff were in fact voted against the consolidation.

Plaintiff points out that the proxy statement tells the stockholders that the consolidation plan had been recommended by the Board of Directors and that it had been "approved by the Board of Directors of Transvision". Taken literally, these statements are not true because the plan had never been submitted at a meeting of the board of directors and had never been voted on. It was true, however, that six of the seven directors did in fact approve the plan of consolidation and these six included King and McKenna, who were independent and who owned, or acted for, shares of stock of Transvision.

Finally, plaintiff says that no recent separate financial statements of Transvision and Pacotronics were given to the stockholders and that these would have shown the current financial position of Transvision to be better than that of Pacotronics.

The proxy statement contained an "unaudited pro forma combined balance sheet" for Pacotronics and Transvision as at October 31, 1962, but did not contain balance sheets for the two companies separately at that date.

The separate balance sheets at October 31, 1962 show that Pacotronics had current assets of $1,402,176.15 and Transvision had current assets of $888,849. The major difference is that Transvision had cash of $546,087; Pacotronics had $53,934.39 in cash, of which $39,000 was to be used as part payment for the 151,970 Transvision shares, and large amounts represented by inventories and accounts receivable. But this difference is not surprising nor particularly significant if in fact Transvision was tapering off its business activity whereas Pacotronics was a going concern.

In concluding that a preliminary injunction should not issue, the Court is influenced by further factors.

■■ Plaintiff made no effort to attack the plan of consolidation during the period from February 26, 1963, when the notice of meeting of stockholders was sent out, to March 22, 1963, when this action was commenced; meanwhile, on March 12, the consolidation documents had been filed in the proper public offices. By such filing the consolidation became effective and rights thereby accrued to third parties. It would be inequitable to permit plaintiff to attack the consolidation after he had delayed until it became effective. Katz v. R. Hoe & Co., 278 App.Div. 766, 104 N.Y.S.2d 14 (1st Dept., 1951).

Plaintiff had a right of appraisal of his shares (Stock Corporation Law §§ 21 and 91(7)) and this seems a fair and just protection. The New York Court of Appeals has flatly declared that after the consolidation has been consummated (as here) the only alternatives open to stockholders are to go along with the consolidation or to receive the appraised value of their shares. Anderson v. International Minerals & Chemicals Corp., 295 N.Y. 343, 67 N.E.2d 573 (1946).

By the consolidation, the $500,000 debt of Pacotronics for the purchase of 151,970 Transvision shares becomes a liability of the new corporation resulting from consolidation. Plaintiff asks for relief from this result, contending that Paco-

tronics should not be enabled to use the cash of Transvision to pay Baruch-Foster for the shares purchased by Pacotronics. It is not quite so simple. Baruch-Foster has already been paid the purchase price. The $500,000 debt incurred in this connection does remain, and it may well be that the cash, formerly belonging to Transvision and now belonging to the new corporation, will be used to discharge the debt. But the 151,970 shares of Transvision bought by Pacotronics are being cancelled; no shares of the new corporation represent these 151,970 Transvision shares and thus the stockholders of Transvision benefit thereby. In substance, it is as if Transvision had bought 151,970 shares of its stock for $500,000 and then retired the shares. It is to be remembered that Suesholtz had actually proposed something very similar, namely, the purchase for retirement by Transvision of up to 90,000 shares of its stock at $3.25 per share.

In this connection, plaintiff relies heavily on Williams v. Bartell, 16 A.D.2d 21, 225 N.Y.S.2d 351 (1st Dept., 1962) where a preliminary injunction was ordered by the Appellate Division and where consolidation of corporations was involved. But even if applicable, the force of this decision is weakened by the strong dissent of two of the justices. In Williams moreover, there were charges of (a) unjust enrichment of two of the defendant directors personally, (b) common directorates of the constituent corporations and (c) adverse and conflicting interests among the directors. Finally, the many differences of fact between Williams and the case at bar reduce to a minimum the persuasive effect of the decision.

In summary, plaintiff believes (like his ally Suesholtz) that the consolidation is a bad thing for the stockholders of Transvision. All the directors of Transvision other than Suesholtz and including the two independent directors believe the consolidation is a good thing. Plaintiff and Suesholtz may nevertheless be right, but with such a question of business judgment this Court should have no concern.

No showing has been made sufficient to justify this Court in setting aside the consolidation by the drastic step of a preliminary injunction. The findings of fact and conclusions of law appear in the foregoing opinion (Fed.R.Civ.P. 52(a)) on which the application is denied and

It is so ordered.